Littleton, Judge,
delivered the opinion of the court:
This is a suit to recover (1) $11,820.96 balance due plaintiff on a rubber storage contract entered into with the Government; (2) $15,911.02 as compensation for services rendered defendant over and above those specified by the contract, and (3) $2,184.63, representing demurrage paid by it on railroad cars due to their delivery to the warehouse in excess of plaintiff’s handling capacity. Defendant concedes *892 liability for this last item of claim. The Government defends its refusal to pay the balance due on the contract on the ground that through plaintiff’s failure to properly store and care for the rubber in question it suffered damage in excess of the amount due. In addition, defendant has filed a counterclaim for $17,533.61 representing the alleged excess of rubber damage over the amount withheld under the contract. Only those facts absolutely necessary to a disposition of this case will be stated in this opinion since a detailed report involving the various claims has been submitted by a Trial Commissioner of this court and is expressly made a part hereof.
In October 1951, a warehouse located at 153 Ganson Street, Buffalo, New York, and owned by the Saperston Beal Estate Company of that city, was offered to General Services Administration for the storage of merchandise. An inspection of the building was made by Government employees who reported that the building would be suitable for the storage of crude rubber if repairs were made to the floor, roof and metal roll-up doors. However, the offer was rejected by GSA because it had received information indicating that the State of New York had condemned the warehouse because of unsafe pilings.
In the spring of 1952 GSA was contacted by a Mr. George E. Weichmann, president of plaintiff corporation, who offered to store Government rubber at the Ganson Street warehouse, at certain stated prices.[1] Mr. Leonard M. Dulberg, who was responsible for obtaining warehouse space for the storage of crude rubber belonging to the United States, pointed out to Mr. Weichmann that prior inspection reports had indicated that numerous repairs would have to be made to the building before it would be acceptable for the storage of rubber. He also told Mr. Weichmann that the Government had been informed that the building had been condemned. Mr. Weichmann thereupon, in several communications with Mr. Dulberg, assured him that the necessary repairs had been or would be made and that the building was approved by the State of New York for the purposes *893 intended. In this latter connection, Mr. Weichmann submitted a letter which purported to show that the Division of Buildings, Department of Public Works, City of Buffalo, New York, had declared the building satisfactory for public merchandise storage. It was not shown at the trial that the signer of the letter was one vested with authority to rule on such matters for the state and city.
At the time the negotiations between plaintiff and defendant were taking place, the United States was the sole purchaser of all rubber imported into the United States and, as a result, was hard put to find storage space for its stockpiling. In this situation, and in view of past satisfactory dealings with Mr. Weichmann, and upon his assurances that the necessary repairs would be effectuated, the GSA accepted plaintiff’s warehouse for the storage of crude rubber on May 7,1952.
Under the terms of the contract entered into between the parties, plaintiff was to take certain steps to insure the protection of the rubber from water and other damage which might occur during storage. It has been found that some of these precautionary measures were not taken by the plaintiff and the contract requirement that all rubber be stored on pallets was disregarded. Apparently, however, the GSA did not require the use of pallets in all situations and verbally waived their use in this case notwithstanding a specific provision of the contract prohibiting oral waivers.
On August 14,1952, after all of the rubber had been stored under the contract, the warehouse was inspected by Government inspectors and plaintiff was required to rearrange and reduce the size of the rubber piles. No mention was made about plaintiff’s failure to store the rubber on pallets. Two other inspections were made by the GSA during the course of the rubber storage in question and in each instance the inspectors reported the poor condition of the building. After the last inspection it was reported that pallets had not been used and it was recommended that the rubber be sold as soon as possible since some water damage had occurred from the elements and the rubber was not deemed fit for stockpile storage. Because of the water damage, the defendant sold the rubber at discounts. These discounts were ar *894 rived at by negotiation between the Government and the purchasers without consultation with, or notice to, the plaintiff.
Plaintiff’s first cause of action is for the recovery of the sum of $11,820.96 which represents the amount withheld by the defendant from balances admittedly due plaintiff for services rendered under the contract. Defendant claims the right to set off such sum on the ground that the rubber suffered water damage to this amount because of plaintiff’s failure to exercise the care required by the contract. Defendant’s counterclaim of $17,533.67 also involves a question of plaintiff’s liability for further damage to the stored rubber due to the same alleged failure on the part of plaintiff to properly store and maintain the rubber.
In an action by a bailee against a bailor for services rendered under a bailment contract, the bailee must show that the services were performed and the bailed article returned. After such a showing, the bailee would be entitled to judgment absent facts pleaded and proved by the bailor that would preclude such recovery. In this case the bailor (defendant) has pleaded a right of set off and has counterclaimed for damage alleged to have occurred to the bailed rubber due to the bailee’s (plaintiff) failure to exercise reasonable care over the property.[2] At this point the burden is on the bailor to establish the bailee’s negligence and the resulting damage to the property. Backus v. Start, 13 Fed. 69. Likewise, the burden is upon the bailor to prove that the property in question was delivered to the bailee in good condition and returned otherwise. We are of the opinion that the defendant has failed to sustain its burden in that it has not shown that the rubber was damaged due to the lack of due care on the part of the plaintiff and also it has not shown that the rubber was in good condition when it was placed in the Ganson Street warehouse.
We arrive at these conclusions not without a considerable measure of difficulty since the record presents conflicting *895 statements and contradictions. The warehouse in question was old and was located on a river in a climate of very high humidity. A casual examination of the building readily disclosed that it was not and could not be rendered watertight. The record also shows repeated efforts on the part of plaintiff to put thé building in proper repair. What part of any water damage sustained by the rubber while, in storage at plaintiff’s warehouse was due to the inherent nature of the building and its location, and what part was due to plaintiff’s failure to exercise the required care in initiating and expediting repairs, cannot be determined. We think that the failure to directly tie up the water damage with some fault or negligence on plaintiff’s part is fatal to defendant’s defense to plaintiff’s first claim. The obvious inference to be drawn from' the record as a whole seems to be that the defendant got just about what it anticipated from the contract i. e., not very good storage facilities for its rubber, and therefore should be liable for the balance remaining due and unpaid. The period covered by the contract was one in which the Government was the sole importer of crude rubber and it was obviously pressed for the necessary storage space. Under such circumstances it would be only normal for it to take whatever accommodations were available notwithstanding their unsuitability under normal conditions. By this we do not mean to imply that a contractor may, in a period of emergency, take unfair advantage of the Government and thereby reap unjustified profits. But where the Government has contracted with its eyes open for something less than perfect, it should not be heard to complain when the time to pay the bill has arrived. Plaintiff is therefore entitled to recover of and from the United States the sum of $11,320.96 on its first cause of action.
Plaintiff’s second cause of action to recover $2,184.63 representing demurrage paid by it on railroad cars due to their delivery to the warehouse in excess of plaintiff’s handling capacity, is uncontested and judgment for that amount will be entered in favor of the plaintiff.
The third cause of action represents the excess of the cost to plaintiff of labor employed in outloading the rubber over the cost of inloading. Under normal circumstances the cost *896 of outloading should be the same as inloading, but as our Trial Commissioner has found, plaintiff’s operation in this respect was not normal. Plaintiff has failed to sustain its burden of proof that the excess costs were the fault of the defendant. If anything, the record shows that the excess cost of outloading was entirely due to plaintiff’s method of in-loading. Plaintiff’s third cause of action is therefore dismissed.
Defendant’s counterclaim is in all respects merely a restatement of its defense to the plaintiff’s first cause of action. Since defendant failed to prove the condition of the rubber prior to storage or that the water damage to its rubber was caused by the fault or negligence of the plaintiff, its counterclaim must be dismissed.
Judgment will be entered for the plaintiff in the amount of $13,505.59 and the counterclaim of defendant is dismissed.
It is so ordered.
Holtzoff, Judge, sitting by designation; Laramore, Judge; Madden, Judge; and Jones, OMef Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of the State of New York. Its offices and principal place of business are in Buffalo, New York, where it is engaged in the business of merchandise storage.
2. Prior to undertaking the rubber storage contract here in suit, the president of Ganson Warehouse, Inc., Mr. George E. Weichmann, and its vice president, Mr. Clarence Amthor, had been associated since 1945 in enterprises which had stored crude natural rubber for the United States in Buffalo, New York. At Seneca Warehouse and Industrial Center, Inc., Mr. Weichmann and Mr. Amthor had stored 20,000 tons of Government rubber. As the Transfer Construction and Contracting Company, Inc., Messrs. Weichmann and Amthor had unloaded and stored in the warehouse of the General Services Administration at 205 Elmwood Avenue, *897 New York, approximately 46,000 tons of rubber. The specifications for the storage of rubber under both of these contracts were essentially identical to the storage requirements of the contract undertaken by Ganson Warehouse, Inc.
3. In October 1951 the Saperston Real Estate Company of Buffalo offered a warehouse located at 153 Ganson Street in that city to the General Services Administration for the storage of merchandise. The facility was visited by Government inspectors in October 1951 and in February 1952. These inspectors reported to the Director, Storage and Transportation Division, Emergency Procurement Service, General Services Administration in Washington, D. C., that, in their opinions, the building would be suitable for the storage of crude rubber if repairs were made to the floor, roof and metal roll-up doors. However, the initial offer of the building was rejected by the General Services Administration because they had received information indicating that the State of New York had condemned the warehouse for unsafe pilings.
4. In the spring of 1952 Mr. Leonard M. Dulberg was the Chief of the Rubber Section, Storage and Transportation Division, Emergency Procurement Service, General Services Administration. As such, he was responsible for obtaining warehouse space for the storage of crude rubber belonging to the United States. On or about April 18, 1952, Mr. Weichmann telephoned Mr. Dulberg in Washington. In the name of Ganson Warehouse, Inc., he offered to store Government rubber at the warehouse at 153 Ganson Street, Buffalo, at certain stated prices. Mr. Dulberg pointed out that prior inspection reports indicated that numerous repairs would have to be made to the building before it would be acceptable for the storage of rubber. He also told Mr. Weichmann that the Government had information that the building had been condemned.
5. On April 22,1952, Mr. Weichmann wrote Mr. Dulberg the following letter:
Confirming our telegram of April 18th, we are herewith quoting following rates for storage at our Ganson Street warehouse — Erie Railroad siding:
*898 $1.25 per ton — 1 way handling
.89 per short ton per month storage
Overtime rates $1.75 per man honr
We have had an inspection of the property, made by onr local authorities, and please be advised that same has been passed and approved, as it has been used as a public warehouse up to the period when we purchased same.
* * * * *
6. On April 24, 1952, Mr. Weichmann forwarded to Mr. JDulberg, the following communication of the same date, addressed to Mr. Weichmann and signed by W. P. Stranahan on letterhead of the Division of Buildings, Department of Public Works, City of Buffalo, New York:
Please be advised that the following building located at 158 Ganson Street, Buffalo, New York formerly known as the Erie Freight House (one story concrete construction with automatic dry pipe sprinkler system) has been inspected by this Department and has been declared satisfactory for public merchandise storage.
The above property being located within second Industrial District.
It has not been shown that the signer of the above letter was one vested with authority to rule on the matters therein discussed.
7. On April 29,1952, Mr. Weichmann telephoned Mr. Dul-berg and advised him that all doors and walls in one section of the warehouse had been repaired; that the sprinkler system had been put in good condition; and that the remaining sections would be repaired by May 9, 1952. The following day Mr.. Weichmann called again to assure Mr. Dulberg that the roof had been repaired and waterproofed.
8. At this time the General Services Administration had and was acquiring tremendous quantities of crude rubber for stockpiling and was hard put to find storage space therefor. In this situation, in view of its past satisfactory experience in dealing with Mr. Weichmann, and upon his assurances that the necessary repairs had been or would be made, the General Services Administration accepted plaintiff’s warehouse for the storage of crude rubber.
*899 9. On April 80, 1952, the following letter signed by J. E. Salisbury, Director, Storage and Transportation Division of the General Services Administration, was sent to Ganson Warehouse, Inc.
We are enclosing herewith a copy of the procedure to be. followed by you in storing natural crude rubber for this Service under Contract Number GS-OOP-4999 /SCM). Additionally, sample forms are also enclosed. A supply of blank forms has been forwarded to you under separate cover.
It is important that the instructions be followed as outlined, both for the protection of the rubber and in the interest of all concerned. In the event that any of the instructions are not completely understood by you, please do not hesitate to call upon this office for the information that you desire.
Your cooperation in respect to this matter will be greatly appreciated by the undersigned.
The instructions accompanying the letter provided in pertinent part:
RUBBER STORAGE
GENERAL INFORMATION FOR STOCKPILE LOCATIONS
Eubber will be loaded in box cars and/or trucks and received in bale form, most of which will weigh either 224 or 250 pounds per bale.
All bales will be marked at the port of entry with the Emergency Procurement Service’s contract and lot number, which must be used for storage and identification purposes. This mark is generally referred to as being the countermark. It will indicate the initials of the supplying contractor, the contract number and the lot number.
Several small lots or portions of large lots may be received in the same car which will require sorting, as all rubber must be stacked separately according to lots. However, in order to obtain better utilization of space, two or more small lots may be stacked one upon the other, provided the bales of the different lots are not intermingled and the different lots are separated by suitable means for identification. Small lots are those •consisting of approximately 125 bales or less.
Durable tags indicating the countermark number, the ■grade, and number of bales in the lot must be firmly attached to each stack, preferably to the dunnage as nails must not be driven into the rubber.
*900 No specific amount or rate of delivery is guaranteed.
Eubber shall not be stored in a fire area containing other Government or non-Government inflammable or high hazard materials. Eubber shall not be stored in basement space.
METHOD OF STACKING
All rubber must be stored on pallets {or dunnage of such character to serve as pallets), raising the rubloer approximately six inches from the floor, and using whatever dunnage as is necessary to insure stability of the pile and separation of lots.
Stacks must not exceed approximately ten feet in height, and all stacks must be approximately three feet from all walls, lowest beams, or sprinkler system heads.
Eubber is to be stored only in areas approved by the Government for the purposes of this contract.
Maximum permissible area of a fire division between fire walls and exterior walls on a single floor shall not exceed 40,000 square feet. Individual stowage piles shall be limited to 2,000 square feet in floor area, and, except for main aisles, which should be approximately ten feet to permit normal operations, a clearance of four feet between stowage piles is considered ample to maintain the pile stowage limitations.
Owing to the deteriorating effect of light upon rubber in storage, all windows or skylights in sections of warehouses where it is stored must be painted with a high grade water paint (black, dark green or dark blue) or covered with some other material to exclude the sun rays and light.
10. By letter dated May 7, 1952, the Acting Director of the Eubber Division, Emergency Procurement Service, General Services Administration, defendant’s contracting officer, formally accepted plaintiff’s offer for the storage and handling of crude natural rubber at plaintiff’s Buffalo, New York facility, effective' on and after May 1, 1952, at the fol-
lowing rates: per tooo-povnd Ton
Storage per month or fraction thereof-$0. 89
Handling-in_ 1.25
Handling-out- 1.25
Overtime handling- 1. 75
Acceptance was contingent upon plaintiff’s agreeing to render services at the rates stated above and in accordance *901 with the contract terms, GSA Form 58 and attachments, copies of which accompanied the letter of acceptance.
11. On June 12,1952, contract No. GS-OOP-4999 (SCM) was executed by George E. Weichmann, president of Gan-son Warehouse, Inc., on behalf of the contractor and George K. Casto, Director, Rubber Division, Emergency Procurement Service, General Services Administration, on behalf of the defendant. The pertinent provisions of the contract were as follows:
Item No. Supplies or Services Quantity (Number of units) Unit unit Price
SUCH STORAGE, HANDLING INTO AND OUT OF CLOSED STORAGE, AND OTHER RELATED WAREHOUSE SERVICES AS MAT BE CALLED FOR BY THE GOVERNMENT IN CONNECTION WITH GOVERNMENT OWNED CRUDE NATURAL RUBBER AT THE RATES HEREINAFTER SPECIFIED.
(1) Storage (per month or fraction thereof). 6, 500 S. T. $0. 89
(2) Handling into closed storage. 6, 500 S. T. $1. 25
(3) Handling out of closed storage. 6, 500 S. T. $1. 25
(4) Overtime Handling_ Estimate: The amount stated is not guaranteed as either a minimum or maximum figure. S. T. $1. 75
GENERAL CONDITIONS EOR STRATEGIC AND CRITICAL MATERIALS AND SERVICES CONTRACTS
* * * * *
6. Oral Modifications. No oral statement of any person shall be allowed in any manner to modify or otherwise affect the terms of the offer, specifications or contract.
7. Inspection and Test, (a) All material and workmanship shall be subject to inspection and test at all times and places and, when practicable, during manufacture. In case any materials, supplies or services are found to be defective in quality, composition, or workmanship, or otherwise not in conformity with the speci *902 fications, tbe Government shall have the right to reject such materials, supplies or services, or to require their correction or replacement, or to accept them at a proper reduction in price. Rejected materials, supplies or services shall be removed by and at the expense of the contractor promptly upon request. The contractor shall be liable to the Government for any cost of removal, correction or replacement resulting from failure to do so as required.
(b) If preliminary or final inspection or test is made on the premises of the contractor or subcontractor the contractor shall furnish or arrange to furnish, without additional charge, all reasonable facilities and assistance. Inspections and tests shall be performed by the Government in such manner as not to unduly delay the work. Special and performance tests shall be made as described in the specifications. The Government reserves the right to charge the contractor for any additional cost of inspection or test when materials, supplies or services are not ready at the time inspection or test is requested by the contractor.
(c) Final inspection and acceptance of the materials, supplies and services will be made after delivery, unless otherwise stated. If final inspection is made at a point other than the premises of the contractor or subcontractor, it shall be at the expense of the Government except for the value of tested samples used and rejected. Final inspection shall be conclusive except as to latent defects, fraud or gross mistake. Final inspection and acceptance or rejection of materials, supplies or services shall be made as promtply as practicable but failure so to inspect and accept or reject materials, supplies or services shall not impose liability on the Government for materials, supplies or services which do not conform to the specifications.
H: Hi He * *

Period of Performance

The services required will commence on or about May 1, 1952, and will continue as required until December 81, 1952. The Government reserves the right to extend the period of this Contract from year to year upon 30 days written notice to the Contractor before the expiration of any calendar year. Either party may terminate the present agreement without cost or obligation, other than for services already performed, upon thirty (30) days written notice to the other party.

*903
Special Terms and Conditions

1. Definitions:
$ ^ ‡ ^
(b) Handling into closed storage shall consist of the furnishing by the Contractor of all labor, equipment, and supervision required incident to:
(1) Eeceiving materials from trucks at warehouse doorsill or platform and stowing within warehouse premises;
(2) Unloading of freight cars on adjacent sidings and stowing materials within warehouse premises;
3. Unloading of freight cars on off-sidings and stowing materials within warehouse premises, including cartage service incident thereto.
(c) Handling out of closed storage shall consist of the furnishing by the contractor of all labor, equipment, and supervision required incident to:
(1) Delivery of materials out of warehouse premises to tailboards of truck at tail-board level;
(2) Handling materials out of warehouse premises to, and stowing within freight cars on adjacent sidings, including dunnage, when required, for the proper stowing of cargo.
(3) Handling materials out of warehouse premises to, and stowing within, freight cars on off-siding, including dunnage, when required, for the proper stowing of cargo and also including cartage service incident thereto.
(d) The term “Warehouseman” shall mean the individual, partnership, corporation or other entity executing the offer on the face sheet of the contract.
(e) The term “Contractor” shall mean the warehouseman whose offer is accepted by the Government.
2. The Crude Natural Eubber that will be furnished by the Government at Contractor’s warehouse will be in bale form, most of which bales will weigh either 224 or 250 pounds each and will be loaded in freight cars and/ or trucks.
3. All bales of Crude Natural Eubber will bear certain so-called counter-marks, such as the name of the Government purchasing agency, the initials of the supplying contractor, the contract and lot numbers, which the Contractor herein involved must use for storage and identification purposes.
*904 4. Several small lots or portions of large lots may be received in the same car, which will require sorting, as all rubber must be stacked separately according to lots. However, in order to obtain better utilization of space two or more small lots may be stacked one upon the other, provided the bales of the different lots are not intermingled and the different lots are separated by suitable means for identification. Small lots are those consisting of approximately 125 bales or less.
5. Eubber shall not be stored in a section of a warehouse with any combustible commodities, rubber
SHALL NOT BE STORED IN BASEMENT EAOILITIES.
6. Method of Stacking
(a) In the absence of a written agreement to the contrary, all rubber must be stored on pallets (or dunnage of such character to serve as pallets), raising the rubber approximately six inches from the floor, and using whatever dunnage as is necessary to insure stability of the pile and separation of lots.
(b) Stacks must not exceed approximately ten feet in height, and all stacks must be approximately three feet from all walls, lowest beams, or sprinkler system.;
(c) Maximum permissible area of a fire division between fire walls and exterior walls on a single floor shall not exceed 40,000 square feet. Individual stowage piles shall be limited to 2,000 square feet in floor area, and, except for main aisles, which should be approximately ten feet to permit normal operations, a clearance of four feet between stowage piles is considered ample to maintain the pile stowage limitations.
(d) Owing to the deteriorating effect of bright light upon rubber in storage, all windows or skylights in sections of warehouses where it is stored are to be painted with water paint or covered with some other material to exclude the sun’s rays. The aforementioned paint must be of a high grade and colored dark blue, dark green or black.
íf*
7. Information on Storage cmd Shipping Facilities
(To be filled in by Contractor)
(a) The exact addresses of warehouse premises in which material under this contract will be or is stored are:
Ganson Warehouse, Inc.
153 Ganson Street, Buffalo, New York
*905 (b) The available receiving and shipping facilities by rail and truck and routing information for in-transit delivery in and out are:
Erie NR
(c) The quantity of material that may be shipped daily calculated in carloads and/or truckloads:
(1) Cars: 5
(2) Trucks: 3
(d) The quantity of material that can be shipped out daily calculated in carloads and/or truckloads:
(1) Cars: 5
(2) Trucks: 3
(e) The Contractor’s premises has (has not) adjacent railroad sidings. (Contractor to indicate correct statement.)
8. Overtime
Overtime must be authorized in writing by the Government. If emergency conditions should arise requiring verbal authority, for overtime work, any such verbal authority given shall be confirmed in writing by the Government promptly.
9. Non-warranty of Services Required
The Government makes no guarantee or warranty, express or implied, as to the quantity of material to be stored under this contract or as to the length of time that such material may be stored in or on the premises of the Contractor. On the contrary, it is expressly understood and agreed that the Government may place in storage or withdraw from storage any quantity of such material as is provided for hereunder at any time during the terms of the Contract and shall be obligated only to pay for such services as are rendered under the contract on a month to month basis.
10. Contractor's Liability
The Contractor shall be liable for any loss or injury of any material stored or serviced under this contract which is caused by the Contractor’s failure to exercise such care in regard to said material as a reasonable careful owner of similar materials would exercise, but the Contractor shall not be liable, in the absence of a written agreement to the contrary, for any loss or injury to the material which could not be avoided by the exercise of such care.
*906 11. Demurrage
The Contractor agrees to hold the Government harmless from any expense or liability for expense for any demurrage provided that shipments to the Contractor are not m excess of the Contractor’s stated handling capacity as specified in Item 7 (c). Any demurrage accruing on cars containing rubber as a result of shipments in excess of the Contractor’s specified handling capacity will be for the account of the Government provided the Contractor has unloaded and released daily not less than the number of cars specified in Item 7 (c). The Contractor further agrees to hold the Government harmless from expense or liability for expense for demurrage incurred on cars held for loading incident to outgoing shipments.
‡ ‡ ‡
15. Reports
The Contractor shall prepare at no additional expense to the Government the following reports in accordance with separate instructions furnished by the Government:
(a) Receiving Form GSA-131 (in lieu of ordinary warehouse receipt).
(b) Outbound Storage Reports in triplicate when requested (GSA-132).
(c) Loss or Damage Form TS-1Y96.
(d) Periodic inventories of material held in storage under the Contract as may be requested by the Government.
(e) Such other forms and reports as may be required in particular cases or under certain circumstances in accordance with instructions issued by the Government.
(f) Record of transit freight bills and tonnage credits Form TS-1901 when requested.
16. Inspection
The Contractor shall allow authorized representatives of the General Services Administration to inspect, at any time during regular business hours, the warehouse (s) in which the material under this contract is stored, the equipment used in connection therewith, the material stored, and the Contractor’s boohs and records pertaining to the material.
In addition, the Contractor shall permit any other party bearing an Inspection Order issued by the Gen *907 eral Services Administration to inspect the material in accordance with the terms of the Inspection Order.
# He ❖ H* *
12. Pallets were not used by the plaintiff in storing the rubber in question. The requirement in the contract that pallets be used was verbally waived by J. E. Salisbury, Director, Storage and Transportation Division of the General Services Administration.
13. Thereafter various lots of crude rubber were shipped by the defendant to plaintiff’s warehouse until August 12, 1952, by which time there had been loaded in some 14,884,028 pounds. From time to time lots were disposed of by defendant, and on its order loaded out by the plaintiff until by the summer of 1954 all rubber had been removed from plaintiff’s warehouse.
14. As a result of efforts of its foreman, plaintiff notified the General Services Administration that it would be able to store 9,000 tons instead of the 6,500 tons originally agreed upon. Accordingly the contract was amended to provide for storage of the additional quantity of rubber.
15. Crude rubber is usually processed for disposition and storage in bales of a symmetrical shape with the lot number plainly stamped or stenciled thereon. However, in the present instance some bales had become warped so that it was difficult to stack them in even piles. Moreover, in a number of cases, the lot markings had become erased or obscured.
16. During the period from December 1950 until June 1952, the Government was the sole purchaser of all rubber imported into the United States. On the termination of the exclusive buying period the Government continued the rubber stockpiling program which had been instituted during World War II.
17. On August 14, 1952, after all of the rubber had been stored under the contract, the warehouse was visited by an inspector of the General Services Administration, William N. Randall. He found the aisles to be inadequate and the piles too large. As a result of Mr. Randall’s visit, the General Service Administration wrote to plaintiff on September 3,1952, ordering reduction in the size of the piles. The pertinent portions of the letter are as follows:
*908 Eeference is made to your letter dated August 18,1952, in which you advise that you are carrying out the suggestions made by Mr. W. H. Eandall of this office at the time of his recent inspection of your warehouse, and in which you also furnish the approximate dimensions of the piles of rubber now stored and which, as Mr. Ean-dall informed you, exceed the limitations set forth hi your contract.
With respect to the center pile in the north wing, the north pile m the center wing and the north pile in the South wing, measuring as stated by you 110' x 55' x 8'— 130' x 55' x 8' — 100' x 55' x 8' — and which cover areas of 6,050 sq. ft., 7,150 sq. ft., and 5,500 sq. ft. respectively, it will be necessary for you to rewarehouse these piles as they greatly exceed your contract specifications.
With respect to the balance of the piles, while most of them exceed the permissible limits they may remain as is due to the lack of available warehouse space and to the 20 foot width of the dock side aisle and the 12 foot width of the aisle on the other side which would make the rubber accessible in event of fire.
When performing the rewarehousing operation extreme care should be taken to prevent either the co-mingling of or scattering lots in various places in your warehouse. Your location records should also be changed and this office advised accordingly.
$ $ $ sK *
18. A casual examination of plaintiff’s warehouse readily disclosed that it was not and could not readily be rendered weathertight. During the storage of rubber, from time to time, the roof would develop leaks, the corrugated iron doors on the railroad side of the building would become rusted or out of adjustment, allowing rain or snow to blow in. The floors were somewhat uneven and in areas in bad repair.
19. On March 6,1953, the warehouse was inspected by Mr. John C. L. Armstrong for the General Services Administration. He reported the poor condition of the building and noted particularly that the corrugated iron doors had not been repaired. He also reported that the rubber was poorly stored without pallets or dunnage. He predicted that it would soon fall.
20. As a result of Mr. Armstrong’s inspection a letter dated April 7, 1953, was addressed to plaintiff. The pertinent portions of the letter are as follows:
*909 At the time of the original inspection of your warehouse and when subsequently visited by our representative, Mr. W. H. Randall, under date of August 27,1952, it was noted that practically all of the doors as well as the floors were in a very dilapidated condition, thus requiring extensive repairs which you informed our representatives would be made promptly.
In this connection we have received an inspection report dated March 6, 1953 from our Inspector Mr. C. L. Armstrong, which indicates that repairs have not been made to either and as practically a year has elapsed since the date of our initial inspection it would seem that you have had ample opportunity ha which to do so, and we might add that it is in your best interests to see that necessary action is taken promptly.
21. Under date of April 16, 1953, plaintiff replied to the above letter of April 7,1953, as follows:
Replying to your letter of April 7, please be advised that we have taken care of numerous repairs since Mr. Randall’s last visit at our facility as of last August 27.
We have installed new controls for fire alarm system and relayed approximately 1,000 sq. ft. of concrete flooring and repaired eight old steel rolling doors and replaced same with solid masonry wall on the west side of the building. This work is now going on and the balance of the openings will be completed as soon as weather permits. We did not dare undertake this work during the bad winter and spring weather we have had as we did not want the rubber exposed to any possibility of moisture damage.
However, I would say that within the next sixty days, the balance of the exterior doors will have been completed as we have men working on this and trust same will be entirely satisfactory to your organization.
As of March 6, Mr. Armstrong’s visit, this work was just about started and I am sure that your next inspector will find that we have made the improvements you desire.
22. In July 1953 a survey team of three inspectors was sent to Ganson Warehouse to inspect the building and the storage of the rubber therein. The team reported the condition of the doors as rusty with gaping holes which permitted the entrance of weather elements. They found the roof to be rotten and leaking and the walls and columns to *910 be cracked. The condition, of the floor was described as very poor. It was noted that the individual piles still exceeded contract limits and that all grades and types of rubber were mixed together with no effort made to segregate by lots. The report also noted the absence of pallets or dunnage which caused moisture damage to bales lying on the rotted floor timbers. The report stated that the rubber had sustained heavy moisture damage and that a major portion of the rubber had developed a very bad mold. The conclusion of the team was as follows:
Due to the poor structural condition and inadequate fire protection of this warehouse, all strategic and critical material should be removed as quickly as possible. In view of the problems involved in the disposal of this damaged rubber, and the continuing inability of the warehouse to display and deliver complete lots, it is suggested that this rubber be moved to a more suitable location and sold as soon as possible as it is not fit for stockpile storage.
EERST CAUSE OE ACTION
23. In this cause of action plaintiff seeks to recover the sum of $11,320.96 as the balance due on its contract GS-OOP-4999. There is no dispute that this is the balance due at contract rates for plaintiff’s services, but defendant claims the right to withhold such sum on the ground that the rubber suffered water damage to this amount due to plaintiff’s failure to exercise the care required by the contract to preserve and protect it.
Some of the water damage to the rubber occurred by reason of the penetration of rain and snow through leaks in the roof and imperfections in the loading doors of the warehouse. At times such leaks would occur and at times the doors would be damaged or blown in by the elements.
However, as stated above, the warehouse was an old building, in a rather bad state of repair, located adjoining the river in a climate of very high humidity. A casual inspection would reveal that it would be very difficult to render and keep it in a condition weathertight and watertight. The defendant was induced to accept it by reason of its *911 overwhelming need for storage space. From the record as a whole the conclusion is tenable that defendant obtained from this contract just about the type of service reasonably to be anticipated.
The plaintiff made repeated efforts to put the building in proper repair. What part of any water damage suffered by the rubber was due to the inherent nature of the building and its location, and what part to plaintiff’s failure to initiate and expedite repairs cannot be determined.
In selling the rubber defendant made to the purchasers allowances or discounts for water damage. These discounts were arrived at by negotiation without consultation with or notice to plaintiff. The method was to examine a small percentage of a lot being sold, to agree upon a price for the damage disclosed in such sample, and to assume that the rest of the lot would show similar damage. While this method is customary in the crude rubber trade, it does not establish the extent of damage, if any, which had occurred to the rubber not actually examined.
Some of the rubber delivered to plaintiff’s warehouse was in good condition and some of the rubber was in poor condition and had already sustained some water damage. It is not established by the record how much of the rubber was in good condition and how much was in damaged condition when the rubber was delivered to the plaintiff’s warehouse.
While the contract under which the rubber was stored required that the rubber be stored on pallets and that care be taken to preserve the rubber in good condition, the Government official responsible for procuring the storage for the rubber in question appears to have been more interested in securing storage for the largest possible amount of rubber rather than in the quality of the storage secured under the contract.
SECOND CAUSE OE ACTION
24. The parties are agreed that plaintiff is entitled to recover on this cause of action $2,184.63, representing demur-rage paid by it on railroad cars due to their delivery to the warehouse in excess of plaintiff’s handling capacity.
*912 THIRD CAUSE OF ACTION"
25. This is a claim for $15,911.02, representing the excess of the cost of labor employed in outloading the rubber over the cost of labor in loading it into the warehouse. It is agreed that the amount is correct.
28.In spite of the storage instructions given to plaintiff prior to execution of the contract, and the specifications for storage in the contract itself,; plaintiff stacked the rubber by carload as it was delivered to the warehouse. The careful segregation of lots required by the contract was not maintained. No pallets were used to raise the rubber off the floor. No written waiver of the contract requirement of the use of pallets was obtained by plaintiff. Insufficient dun-nage was used to keep the piles neatly stacked. The individual piles of rubber far exceeded the contract limit of 2,000 square feet.
27. After the initial visit of Mr. Eandell in August 1952, plaintiff was ordered to reduce the size of the rubber piles to the contract limits. Plaintiff reduced the piles by cutting aisles through the piles. The rubber thus cut out was either stacked on top of the remaining piles or removed to another section of the warehouse. The evidence does not establish that these changes were recorded by plaintiff in the lot location records of changes in position of lots or portions of lots.
28. The records kept by the plaintiff to show the location of the various lots were far from accurate or complete, and plaintiff would experience difficulty and at times inability to find the desired lot. At times it was necessary to remove superimposed lots in order to get to the lot desired.
29. While there is testimony to the effect that the inloading and outloading expenses should be the same, in the nature of things such would not be the case. In inloading, plaintiff could suit its convenience as to the placing of the various lots, but in outloading might find the desired lots not conveniently located for disposition.
30. In view of the above circumstances it is concluded that plaintiff’s disregard of contract requirements in inloading the rubber may have resulted in reduced costs of this operation at the expense of increased costs for the outloading. *913 Plaintiff bas failed to show that its excess of ontloading costs over inloading costs was tbe fault of defendant.
COUNTERCLAIM AND FIRST AMENDED COUNTERCLAIM
31. Defendant sold 5,255,566 pounds of rubber from plaintiff’s warehouse to Carl Loeb, Rhodes and Company on an as-is, where-is contract. An allowance of one-fourth cent per pound for water damage was granted the purchaser in arriving at the sales price. The allowance thus given totaled $13,132.92. Defendant has asserted a counterclaim for this amount.
32. In addition to the above counterclaim, defendant has asserted a counterclaim for $4,400.75 allowed to defendant’s purchasers for water damage to 1,618,110.35 pounds of additional rubber stored in plaintiff’s warehouse. By a clerical oversight no claim had previously been asserted against plaintiff for these allowances.
33. The above sales were made without consultation with or notice to the plaintiff, and without an opportunity for plaintiff to participate in any of the negotiations. The allowances for water damage were arrived at even more casually than as described hereinabove, under the first cause of action. (Finding 23.) The sales were made to effect disposition of the entire stock of rubber which had been stored in plaintiff’s warehouse, and the allowances were in the nature of concessions in order to expedite such disposition.
34. It has not been established by the record that the allowances made in the sale of this rubber, or any specific part thereof, were due to plaintiff’s failure to exercise the care required by the contract.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States thirteen thousand five hundred five dollars and fifty nine cents ($13,505.59). The defendant is not entitled to recover on its counterclaim and it will therefore be dismissed.

 It does not appear in the record Just how Mr. Weichmann and the Ganson Warehouse company came into possession of the warehouse.

 Article 10 of the contract states that the contractor will be liable for any loss caused by “failure to exercise such care in regard to said material as a reasonable careful owner of similar materials would exercise.” This is little more than a restatement of the law with respect to the care required of a bailee.